**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EVEREST INDEMNITY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ENGLE MARTIN & ASSOCIATES, LLC,<br><br>Defendant. | Civil Action No. 19-15564 (MAS) (LHG)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendant Engle Martin & Associates, LLC's ("Engle Martin") Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue or, Alternatively, to Transfer Venue. (ECF No. 8.) Plaintiff Everest Indemnity Insurance Company ("Everest") opposed (ECF No. 15) and Engle Martin replied (ECF No. 23). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Engle Martin's Motion is denied.

### I.    BACKGROUND[1]

#### A.    The Agreement

Everest is an insurance company organized under the laws of Delaware and maintains its principal place of business in New Jersey. (Compl. ¶ 1, ECF No. 1.) Engle Martin is a claims

---

[1] For purposes of the instant Motion, Everest "is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citation omitted) (personal jurisdiction); *Bockman v. First Am. Mktg. Corp.*, 459 F. App'x 157, 158 n.1 (3d Cir. 2012) (venue).

management company organized under the laws of, and maintains its principal place of business in, Georgia.[2] (*Id.* ¶ 2.) In or about December 2010, the parties executed a Contract for Claim Handling and Adjusting Services (the "Agreement") whereby Engle Martin agreed to act as a third-party administrator for insurance claims made by Everest's policyholders nationwide. (*Id.* ¶¶ 3–4; *see generally* Agreement Doc., Ex. D to Pl.'s Opp'n Br., ECF No. 17-1.) The Agreement is governed by New Jersey law and requires Engle Martin to "indemnify, defend, and hold [Everest] harmless" for any claim arising from the acts or omissions of Engle Martin or its agents. (Agreement Doc. 10, 15.)

The parties entered into the Agreement following "negotiat[ions] by way of email communications that Engle Martin directed to Everest personnel in New Jersey." (Certification of Joseph M. Dazzo ("Dazzo Certif.") ¶ 4, ECF No. 17.) An Everest executive "based exclusively out of" the company's New Jersey headquarters executed the Agreement on Everest's behalf. (*Id.* ¶¶ 5–6.) During the Agreement period, "Engle Martin handled hundreds of claims for Everest, including at least [eighty-five] claims in New Jersey," and regularly directed correspondence relating to those claims to the company's New Jersey office. (*Id.* ¶ 9.) Specifically, Engle Martin sent "claim-related communications" to, and "took direction on how to handle claims from," Everest personnel on a daily basis. (*Id.* ¶¶ 10, 13.) On a weekly basis, "Engle Martin sent invoices and requests for payment." (*Id.* ¶ 11.) On a monthly basis, "Engle Martin sent claims files, including claims history and financial transaction files." (*Id.* ¶ 12.)

In addition, Engle Martin personnel have visited Everest's New Jersey office. Engle Martin executives, for example, visited "on several occasions to discuss matters relating to" the

---

[2] Engle Martin website indicates it "is a national company" operating out of seventy offices located in thirty-seven states. (Def.'s Website, Exs. B & C to Pl.'s Opp'n Br, ECF No. 16-1.)

2

Agreement. (*Id.* ¶ 15.) Engle Martin field adjustors also visited "regularly as part of Engle Martin's on-going performance under" the Agreement while "business development and client relations personnel visited . . . at least four times per year to manage the relationship." (*Id.* ¶¶ 16–17.)

### B. The Lafayette Claim

One of the "hundreds of claims" handled by Engle Martin for Everest involved commercial property located in San Antonio, Texas (the "Property"), and owned by Lafayette Place Condominiums ("Lafayette").[3] (Compl. ¶ 12.) In May 2016, Lafayette reported a claim for damages to the Property caused "by hail and wind during a storm" (the "Lafayette Claim"). (*Id.* ¶¶ 13–14.) Lafayette notified both Engle Martin and Everest. (*See* Claim Report \*26,[4] Ex. G to Pl.'s Opp'n Br., ECF No. 16-1.) An Engle Martin employee from the company's Georgia office responded with correspondence acknowledging receipt of the claim and directed copies of that correspondence to Everest personnel in New Jersey. (May 2016 Correspondence \*33, Ex. G to Pl.'s Opp'n Br., ECF No. 16-1.) Everest then instructed Engle Martin to confirm the cause of the loss and adjust the claim accordingly. (May 2016 E-Mail Correspondence ("EC") Thread \*35–36, Ex. H to Pl.'s Opp'n Br., ECF No. 16-1.)

In June 2016, an Engle Martin field adjuster based in the company's Fort Lauderdale office traveled from Florida to Texas to inspect the Property. (Compl. ¶ 23; Field Adjuster Profile \*53, Ex. K to Pl.'s Opp'n Br., ECF No. 16-1.) After completing his investigation, the field adjuster concluded that no coverage existed and submitted a corresponding report to Engle Martin. (Coverage Report \*55–59, Ex. L to Pl.'s Opp'n Br., ECF No. 16-1.) Consequently, Engle Martin

---

[3] The Everest policy covered Lafayette's Property from December 2015 to December 2016. (Compl. ¶ 5.)

[4] Page numbers preceded by an asterisk refer to the page number on the ECF header.

3

denied the Lafayette Claim. (Compl. ¶¶ 23–26.) Engle Martin, however, neither notified Everest of the field adjuster's findings nor obtained Everest's approval to deny the claim as required under the Agreement. (*Id.* ¶¶ 16, 26.)

In August 2017, Lafayette filed a lawsuit against Everest and Engle Martin's field adjuster "in Texas alleging that Everest (through the acts and omissions of [Engle Martin's] field adjuster) wrongfully denied" the Lafayette Claim (the "Coverage Action"). (*Id.* ¶ 27.) Specifically, Lafayette alleged that the field adjuster inadequately investigated the Property and disregarded evidence demonstrating that a covered loss existed. (*Id.* ¶¶ 28–29.) Following two years of litigation, Everest and Lafayette settled the Coverage Action pursuant to a confidential settlement agreement. (*Id.* ¶ 35.) Thereafter, "Everest demanded that [Engle Martin] indemnify and hold [it] harmless in accordance with the Agreement" but Engle Martin "refused to do so." (*Id.* ¶ 36.)

On July 18, 2019, Everest filed the underlying action against Engle Martin for breach of contract and common law indemnification. (*Id.* ¶¶ 37–49.) On September 30, 2019, Engle Martin filed the instant Motion seeking to dismiss the Complaint for lack of personal jurisdiction and improper venue or, alternatively, to transfer the matter to a federal court in Texas. (ECF No. 8.)

## II. LEGAL STANDARD

### A. Personal Jurisdiction

Under Rule 12(b)(2),[5] a defendant may move to dismiss an action for lack of personal jurisdiction. "[O]nce a defendant has raised a jurisdictional defense," the plaintiff must "prov[e] by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (citations omitted).

---

[5] All references to a "Rule" or "Rules" refer to the Federal Rules of Civil Procedure, unless otherwise noted.

4

In a diversity action, a New Jersey federal court "has jurisdiction over parties to the extent provided under New Jersey state law." *Miller Yacht Sales*, 384 F.3d at 96. "New Jersey's long arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Id.* (citation omitted). "Thus, parties who have constitutionally sufficient 'minimum contacts' with New Jersey are subject to suit there." *Id.*

A federal district court may exercise two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007). Specific jurisdiction allows a court to exercise jurisdiction over a non-resident defendant where: (1) the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum"; (2) the litigation "arise[s] out of or relate[s] to at least one" of those contacts; and (3) the exercise of jurisdiction "comport[s] with fair play and substantial justice." *Id.* (first and fourth alterations in original) (internal quotation marks and citations omitted).

When the district court does not hold an evidentiary hearing, "the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales*, 384 F.3d at 97 (citation omitted). "Once the plaintiff has shown minimum contacts, the burden shifts to the defendant, who must show that the assertion of jurisdiction would be unreasonable." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992).

**B.   Venue**

Rule 12(b)(3) permits a court to dismiss a complaint, or a count therein, for improper venue. Section 1391, in turn, provides the guidelines for determining where venue is appropriate. 28 U.S.C. § 1391. Under Section 1391, venue is proper in a judicial district where: (1) any defendant resides, if all defendants reside in the same state; (2) a "substantial part of the events or omissions

giving rise to the claim occurred"; or (3) the defendant is subject to the court's personal jurisdiction, if there is no district in which the action may otherwise be brought. 28 U.S.C. § 1391(b)(1)–(3).

On a Rule 12(b)(3) motion, the moving party bears the burden of establishing improper venue. *Bockman*, 459 F. App'x at 160 (citing *Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724 (3d Cir. 1982)). Similar to a motion based on personal jurisdiction, a court considering a Rule 12(b)(3) motion must accept the allegations of the complaint as true, unless the allegations are contradicted by the defendant. *Id.* at 158 n.1 (citation omitted).

### C. Transfer

A court may transfer a civil action to a different venue under 28 U.S.C. §§ 1404(a) or 1406(a). Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Under Section 1406(a), a civil action filed in the "wrong division or district shall [be] dismiss[ed], or if it be in the interest of justice, transfer[red] . . . to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The Third Circuit has explained that "Section 1404(a) provides for the transfer of a case where both the original and the requested venue are proper. Section 1406[(a)], on the other hand, applies where the original venue is improper and provides for either transfer or dismissal of the case." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 878 (3d Cir. 1995). The moving party bears the burden of demonstrating that transfer is warranted. *Id.* at 879 (citation omitted).

6

## III. DISCUSSION

### A. Parties' Positions

Engle Martin argues this Court lacks personal jurisdiction because it is a Georgia-based company and "[a]ll of [Everest's] claims arise out of the services contracted to be performed in Texas." (Def.'s Moving Br. 5, ECF No. 8-1.) Engle Martin asserts that whether it performed "services in New Jersey with respect to *other* properties and *other* contracts does not subject it to personal jurisdiction with respect to *this* property and *this* contract." (*Id.* at 8.) In addition, Engle Martin argues venue is improper because it is not a resident of New Jersey and "all substantial events" giving rise to the underlying claims occurred in Texas. (*Id.* at 10.) Alternatively, Engle Martin argues this matter should be transferred to the Western District of Texas because the present claims arose in that district. (*Id.* at 15–19.)

In opposition, Everest asserts that Engle Martin mischaracterizes the Agreement by "describing it as . . . a contract that was particular to the Lafayette [C]laim and that specifically required Engle Martin to perform services in Texas only." (Pl.'s Opp'n Br. 19, ECF No. 15.) Everest asserts, rather, that the Lafayette Claim merely arose from the Agreement, which provides for claim management services to be performed nationwide. (*Id.* at 1–3.) As to the Agreement, Everest argues that the nature and quality of the parties' business relationship establishes sufficient minimum contacts to subject Engle Martin to personal jurisdiction in New Jersey. (*Id.* at 19.) Everest also contends that venue is proper because Engle Martin is deemed a resident under the relevant statute. (*Id.* at 25.) Finally, Everest argues that Engle Martin fails to demonstrate transfer is warranted because Engle Martin's arguments are based on the flawed premise that the present claims seek to relitigate the Coverage Action that took place in Texas. (*Id.* at 30–34.)

## B. Everest Established a Prima Facie Case of Specific Personal Jurisdiction

"With respect to interstate contractual obligations, . . . parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 260 (3d Cir. 2000) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 473 (1985)). Although "[t]he mere existence of a contract is insufficient to establish minimum contacts," "a contract is typically an intermediate step between past negotiations and future transactions." *Budget Blinds, Inc. v. White*, 536 F.3d 244, 261 (3d Cir. 2008) (citing *Burger King*, 471 U.S. at 478). "It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum." *Burger King*, 471 U.S. at 479.

Once the requisite minimum contacts are established, these contacts "may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id.* at 476 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)). These "fairness factors" include: "'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.'" *Id.* at 476–77 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)).

### 1. Engle Martin Purposefully Availed Itself of the Privilege of Conducting Business in New Jersey

Initially, the Court notes that the Agreement does not limit services to any particular state, let alone Texas, as Engle Martin seems to suggest. (*See, e.g.*, Def.'s Moving Br. 5 (Engle Martin "is a Georgia company that contracted with [Everest] to handle any insurance claims arising from real property located in San Antonio, Texas.").) Rather, the Agreement, from which the Lafayette Claim arose, contemplates the performance of services nationwide. (Compl. ¶ 12; *see* Agreement Doc. 5, 18.) Therefore, in determining minimum contacts, the Court "consider[s] the totality of the circumstances" surrounding the Agreement—not the Lafayette Claim—"including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing." *Remick v. Manfredy*, 238 F.3d 248, 256 (3d Cir. 2001).

In support of establishing personal jurisdiction, Everest submits a certification from Dazzo, Everest's Assistant Vice President of Property and Inland Marine Claims. (*See generally* Dazzo Certif.) Dazzo asserts that Engle Martin negotiated the Agreement via communications directed to Everest in New Jersey, where the parties ultimately executed the Agreement. (*Id.* ¶¶ 4–6.) Further, Dazzo asserts that Engle Martin handled "hundreds of claims" for Everest over the course of five years, including at least eighty-five claims in New Jersey. (*Id.* ¶ 9.) Dazzo also asserts that, during the Agreement period, Engle Martin personnel regularly made business visits and directed claims-related communications to New Jersey. (*Id.* ¶¶ 9–17.) Citing *Burger King*, Everest argues that these facts, in conjunction with the Agreement's choice-of-law provision providing that New Jersey law shall govern, demonstrate that Engle Martin purposefully established minimum contacts with New Jersey. (Pl.'s Opp'n Br. 19.) The Court agrees.

In *Burger King*, the Supreme Court found jurisdiction proper where the non-resident defendant "deliberately 'reach[ed] out beyond' [his home forum in Michigan] and negotiated with

9

a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." *Id.* at 479–80 (citation omitted). The Supreme Court noted that the defendant entered "a [twenty]-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida." *Id.* at 480. According to the Supreme Court, the quality and nature of such relationship "can in no sense be viewed as random, fortuitous, or attenuated." *Id.* (internal quotation marks and citations omitted). Further, the Supreme Court found that the Eleventh Circuit, in finding jurisdiction improper, "gave insufficient weight to provisions in the [contract] providing that all disputes would be governed by Florida law." *Id.* at 481. The Supreme Court reasoned that "[a]lthough such a provision standing alone would be insufficient to confer jurisdiction, . . . when combined with the [twenty]-year interdependent relationship [the defendant] established with Burger King's Miami headquarters, it reinforced his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Id.* at 482.

Here, the Court finds that Engle Martin purposefully established minimum contacts with New Jersey. Engle Martin deliberately reached out from its home forum in Georgia and negotiated with a New Jersey company for a contract to perform claim management services nationwide. *See id.* at 479–80; *see also Grand Ent. Grp. Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993) ("contract negotiations with forum residents can empower a court to exercise personal jurisdiction over persons outside the forum"). The parties performed under the Agreement for over five years, during which time Engle Martin personnel regularly made business visits and directed claims-related communications to New Jersey. *See Grand Ent. Grp.*, 988 F.2d at 482 ("Mail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction."); *see also Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172

10

(3d Cir. 2006) ("Traveling to the forum . . . can constitute purposeful availment, regardless of who solicited the contact. Moreover, physical presence in the forum is no longer determinative in light of modern commercial business arrangements; rather mail and wire communications can constitute purposeful contacts when sent into the forum."). These contacts with New Jersey were neither random, fortuitous, nor attenuated.[6] Moreover, considering these contacts, the Agreement's choice-of-law provision providing for application of New Jersey law weighs in favor of personal jurisdiction. *Budget Blinds*, 536 F.3d at 261 (citing *Burger King*, 471 U.S. at 482). As in *Burger King*, these facts support a finding that Engle Martin purposefully established minimum contacts with New Jersey. *Burger King*, 471 U.S. at 480–82.

Engle Martin's attempt to distinguish *Burger King* is wholly unpersuasive. In a conclusory manner, Engle Martin merely states that it "did not reach out to New Jersey or direct activity there" but rather "reached out to Texas and purposefully directed conduct there when investigating and handling the insurance claim for the Texas Property." (Def.'s Reply Br. 10–11.) Engle Martin, however, appears to overlook the fact that the Lafayette Claim was but one assignment under the Agreement. In doing so, Engle Martin conflates the Lafayette Claim with the overall Agreement when advancing its arguments against personal jurisdiction.[7] It is the totality of the circumstances surrounding the Agreement, however, not the Lafayette Claim, that the Court considers in determining whether minimum contacts exist. *Remick*, 238 F.3d at 256.

---

[6] Notably, Engle Martin does not challenge Dazzo's assertions regarding its contacts with New Jersey. Instead, Engle Martin focuses solely on the allegations raised in the Complaint. (*See, e.g.*, Def.'s Reply Br. 3 ("*All* conduct that [Everest] alleges in the Complaint concerns actions occurring *outside* of New Jersey.").)

[7] More specifically, as Everest notes, Engle Martin conflates the dispute between (1) Everest and Lafayette regarding the Lafayette Claim and the resulting Coverage Action; with (2) Everest and Engle Martin regarding the Agreement allegedly being breached by the mishandling of the Lafayette Claim. (Pl.'s Opp'n Br. 3.)

Engle Martin also asserts that the "[n]egotiation of a contract" and "the act of entering into a contract" with a non-forum entity do not establish minimum contacts, "especially where the contract requires performance in another state." (*Id.* at 7–8.) In addition, Engle Martin posits that the choice-of law provision "has nothing to do with whether [it] may be subject to personal jurisdiction in New Jersey." (Def.'s Reply Br. 5.) As *Burger King* instructs, however, these factors taken together support a finding that a defendant purposefully established minimum contacts with the forum. 471 U.S. at 480–82 ("Nothing in our cases, however, suggests that a choice-of-law provision should be ignored in considering whether a defendant has purposefully invoked the benefits and protections of a State's laws for jurisdictional purposes." Rather, "when combined with the . . . interdependent relationship [the defendant] established with [the company's] headquarters, it reinforced his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."). As discussed, the quality and nature of the parties' business relationship demonstrates that Engle Martin purposefully established minimum contacts with New Jersey. The Court, accordingly, finds that Engle Martin purposefully availed itself of the privilege of conducting business in New Jersey.

2.  **Everest's Claims Relate to Engle Martin's Contacts with New Jersey**

Everest's two-count action alleges that Engle Martin failed to handle the Lafayette Claim in accordance with the Agreement and thereafter failed to provide indemnification following settlement of the resulting Coverage Action. (Compl. ¶¶ 37–49.) According to Engle Martin, these "claims arise out of the services contracted to be performed in Texas" and not "from any of [its] activity directed towards New Jersey." (Def.'s Moving Br. 5; Def.'s Reply Br. 10.) As discussed, however, Engle Martin conflates the Lafayette Claim with the overall Agreement. As Everest notes, the Complaint does not seek a "re-trial" of the Coverage Action but rather centers on Engle

Martin's alleged failure to consult with Everest and obtain its approval before unilaterally denying the Lafayette Claim. (Pl's Opp'n Br. 4–5.) Thus, in determining whether Everest's claims "arise from or relate to" Engle Martin's contacts with New Jersey, the focus is not narrowly confined to whether Engle Martin improperly investigated the Property but rather whether Engle Martin mishandled the insurance claim pursuant to the Agreement.

Here, contrary to its assertion, Engle Martin did contact New Jersey with respect to the Lafayette Claim when it directed copies of the acknowledgement letter to Everest personnel in New Jersey. (Def.'s Reply Br. 7 ("Defendant did not make contact with New Jersey with respect to the basis of Plaintiff's claims"); *but see* May 2016 Correspondence *33 (directing Everest copies of the letter to Lafayette acknowledging receipt of the loss notice).) Everest responded, instructing Engle Martin to investigate the matter and adjust the claim accordingly. (May 2016 EC Thread *35–36.) Engle Martin then directed a Florida-based field adjuster to inspect the Property. (*See* Compl. ¶ 23.) It is Engle Martin's alleged failure to follow up with Everest by not reporting the findings of the investigation and unilaterally denying the Lafayette Claim that gives rise to the present claims. (*Id.* ¶¶ 37–49.) The fact that the alleged injury did not arise within New Jersey does not defeat personal jurisdiction. *See Al-Ghena Int'l Corp. v. Radwan*, 957 F. Supp. 2d 511, 528 (D.N.J. 2013) ("Nor is specific jurisdiction defeated merely because the bulk of harm occurred outside the forum."); *see also Burger King*, 471 U.S. at 469, 480 (rejecting defendant's argument that personal jurisdiction did not exist because the breach of contract claim did not arise within Florida). As in *Burger King*, "the dispute [between the parties] grew directly out of 'a contract which had a substantial connection with'" New Jersey. *Burger King*, 471 U.S. at 479. The Court, accordingly, finds that the present claims relate to Engle Martin's contacts with New Jersey.

Engle Martin does not address, much less "present a compelling case[,] that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477. Nor is the Court aware of any factor that would render jurisdiction in this district unreasonable. As the Supreme Court noted in *Burger King*, "where individuals purposefully derive benefit from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities." *Id.* at 473-74 (internal quotation marks and citation omitted). Here, the quality and nature of the parties' relationship under the Agreement are such that Engle Martin purposefully availed itself of the privilege of conducting business in New Jersey. Consequently, Engle Martin cannot use "the Due Process Clause . . . as a territorial shield to avoid interstate obligations that [it] voluntarily assumed." *Id.* at 74. Under these facts, the exercise of jurisdiction would comport with fair play and substantial justice. The Court, accordingly, finds that Everest established a prima facie case of specific personal jurisdiction.

### C. Venue Is Proper in the District of New Jersey

Under Section 1391, venue is proper where: (1) any defendant resides; (2) a "substantial part of the events or omissions giving rise to the claim occurred"; or (3) the defendant is subject to personal jurisdiction and there is no district in which the action may otherwise be brought. 28 U.S.C. § 1391(b)(1)–(3). Section 1391(c)(2) further provides that a corporate defendant is "deemed to reside . . . in any jurisdiction in which such defendant is subject to the court's personal jurisdiction." 28 U.S.C. § 1391(c)(2). Engle Martin bears the burden of demonstrating that venue is improper. *Bockman*, 459 F. App'x at 158 n.1 (citation omitted).

Here, Engle Martin contends that venue is not proper under Section 1391(b)(1) because it is a resident of Georgia, not New Jersey. (Def.'s Moving Br. 11.) For purposes of venue, however, Engle Martin is "deemed to reside in any jurisdiction in which [it] is subject to the court's personal

jurisdiction." 28 U.S.C. 1391(c)(2). Having found that Engle Martin is subject to personal jurisdiction, the Court further finds that venue is proper in this district under Section 1391(b)(1).[8] *See, e.g., Cosmopolitan Shipping Co., Inc. v. Cont'l Ins.*, No. 17-4933, 2018 WL 1617701, at *3 (D.N.J. Apr. 3, 2018) (finding venue "clearly proper under Section 1391(b)(1)" where the non-resident corporate defendant was deemed a resident under Section 1391(c)(2) because it was subject to the court's personal jurisdiction).

### D. Engle Martin Fails to Demonstrate that Transfer Is Warranted

Because venue is proper, Section 1404(a) provides the criteria for determining whether transfer is warranted. *See Jumara*, 55 F.3d at 878 ("Section 1404(a) provides for the transfer of a case where both the original and the requested venue are proper" whereas Section 1406(a) "applies where the original venue is improper."). Under Section 1404(a), courts consider judicially recognized private and public interest factors along with the enumerated factors, including convenience of the parties, convenience of the witnesses, and the interest of justice. *Id.* at 879. It is well-established that the "plaintiff's choice of venue should not be lightly disturbed." *Id.* (citations omitted). The moving party bears the burden "to establish that a balancing of proper interests weigh[s] in favor of the transfer" and "unless the balance . . . is strongly in favor of [the] defendant, the plaintiff's choice of forum should prevail." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970) (internal quotation marks and citations omitted).

#### 1. The Private Interest Factors Do Not Weigh in Favor of Transfer

The Third Circuit has identified the following six private interest factors for courts to consider: (1) the plaintiff's choice of venue; (2) the defendant's preferred forum; (3) where the

---

[8] Because the Court finds that venue is proper under Section 1391(b)(1), the Court does not reach Engle Martin's remaining arguments.

15

claim arose; (4) the "convenience of the parties as indicated by their relative physical and financial condition"; (5) the convenience of the witnesses with respect to their availability for trial; and (6) the extent to which records or other documentary evidence would be available for production. *Jumara*, 55 F.3d at 879 (citations omitted).

As to factors one and two, Everest's choice of venue is entitled to greater weight than Engle Martin's preferred forum particularly where, as here, Everest elected its home forum. *Ricoh Co. v. Honeywell, Inc.*, 817 F. Supp. 473, 480 (D.N.J. 1993) ("When a plaintiff chooses [its] home forum, the choice is 'entitled to greater deference.'" (citation omitted)). As to factor three, the Court rejects Engle Martin's assertion that the claims arose in Texas for the reasons set forth above. Next, the Court finds that factor four is neutral because both parties are national companies and neither party presents any evidence of financial distress.

As to factor five, Engle Martin argues that "first-hand witnesses to [the] inspection and investigation of the San Antonio property will be in Texas, including representatives from Lafayette." (Def.'s Moving Br. 18.) Engle Martin, however, fails to acknowledge that the "first-hand witnesses" include its Florida-based field adjuster, who inspected the Property, and employees from its Georgia office, who allegedly failed to follow up with Everest on the matter. As Everest notes, while Lafayette "employees and residents may have had some information concerning the underlying Coverage [Action], they would not have first-hand knowledge of the [Agreement] or Engle Martin's [alleged] failure to consult with Everest concerning the claim." (Pl.'s Opp'n Br. 31–32.) It is the alleged mishandling of the Lafayette Claim under the Agreement, and not solely the alleged improper inspection of the Property, that is at issue in the present matter. Factor five, therefore, does not weigh in favor of transfer to Texas. Finally, factor six is neutral because, as Engle Martin acknowledges, "document production [c]ould proceed electronically."

(Def.'s Moving Br. 17 n.2.) On balance, the Court finds that the private interest factors do not weigh in favor of transfer.

### 2. The Public Interest Factors Do Not Weigh in Favor of Transfer

The Third Circuit has identified the following six public interest factors for courts to consider: (1) enforceability of any judgment; (2) practical considerations that make the trial easy, expeditious, or inexpensive; (3) relative administrative difficulty resulting from court congestion; (4) local interest in deciding the controversy; (5) relative importance of public policies; and (6) the judge's familiarity with the applicable state law in diversity cases. *Jumara*, 55 F.3d at 879–80 (citations omitted).

Here, factor one is neutral because, as Engle Martin acknowledges, "judgment could be enforced in either district." (Def.'s Moving Br. 17.) The Court rejects Engle Martin's arguments for factors two, three, and six because they are based on the flawed premise that the present claims seek review of the Coverage Action.[9] The Court also finds factors four and five, which Engle Martin does not address, neutral. As with the private factors, the Court finds that the public interest factors do not weigh in favor of transfer. The Court, accordingly, finds that Engle Martin fails to satisfy its burden of demonstrating that transfer is warranted.

---

[9] As to factor two, Engle Martin argues that it would be an "undue burden" to force Lafayette witnesses to travel to New Jersey. (Def.'s Moving Br. 18.) As discussed, however, the relevant witnesses include the Florida-based field adjuster and employees from the company's Georgia office. As to factor three, Engle Martin argues that Texas has a strong local interest because "the claims arose from damage to real property" in its district. (*Id.*) Again, Engle Martin's argument assumes that the Lafayette Claim is solely at issue in the present matter. As to factor six, Engle Martin asserts that "this case will include Texas insurance law." (*Id.* at 19.) The Agreement, however, is governed by New Jersey law. (Agreement Doc. 15.)

## IV. CONCLUSION

For the reasons set forth above, Engle Martin's Motion to Dismiss is denied. The Court will enter an Order consistent with this Memorandum Opinion.

/s/ Michael A. Shipp

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**